Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/23/2018 12:11 AM CST

Edgar Cruz, as father and next friend of
Hazel N. Cruz, a minor child, appellant,
v. Carlos J. Lopez et al., appellees.

___ N.W.2d ___

Filed November 9, 2018.    No. S-17-1240.

1.  **Summary Judgment: Appeal and Error.** In reviewing a summary
    judgment, an appellate court views the evidence in the light most
    favorable to the party against whom the judgment was granted, giv-
    ing that party the benefit of all reasonable inferences deducible from
    the evidence.
2.  **Statutes: Appeal and Error.** Statutory interpretation presents a ques-
    tion of law, for which an appellate court has an obligation to reach
    an independent conclusion irrespective of the decision made by the
    court below.
3.  **Negligence: Proof.** In order to recover in a negligence action, a plaintiff
    must show a legal duty owed by the defendant to the plaintiff, a breach
    of such duty, causation, and damages.
4.  **Negligence.** The question whether a legal duty exists for actionable
    negligence is a question of law dependent on the facts in a particular
    situation.
5.  **Summary Judgment.** The mere existence of some alleged factual dis-
    pute between the parties will not defeat an otherwise properly supported
    motion for summary judgment; only disputes over facts that under the
    governing law might affect the outcome of the suit will properly pre-
    clude the entry of summary judgment.
6.  **Employer and Employee: Negligence: Liability.** Under the doctrine
    of respondeat superior, an employer is held vicariously liable to third
    persons for the employee's negligence in the course of the employer's
    business.
7.  **Negligence: Liability: Contractors and Subcontractors.** One who
    employs an independent contractor is generally not liable for physical

harm caused to another by the acts or omissions of the contractor or its servants.

8. **Employer and Employee: Independent Contractor: Master and Servant.** Ordinarily, a party's status as an employee or an independent contractor is a question of fact. However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law.

9. **Negligence: Liability: Contractors and Subcontractors.** An employer of an independent contractor can be liable for physical harm caused to another if (1) the employer retains control over the contractor's work, (2) the employer is in possession and control of premises where the injury occurred, (3) a statute or rule imposes a specific duty on the employer, or (4) the contractor's work involves special risks or dangers.

10. **Negligence: Liability: Contractors and Subcontractors: Words and Phrases.** A nondelegable duty means that an employer of an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed.

11. **Contractors and Subcontractors: Employer and Employee: Liability.** To fall within the control exception to the general rule of nonliability, the general contractor's involvement in overseeing the work must be substantial. Furthermore, that control must directly relate to the work that caused the injury.

12. ____: ____: ____. To impose liability on a property owner or general contractor for injury to an independent contractor's employee based upon the owner's retained control over the work, the owner or general contractor must have (1) supervised the work that caused the injury, (2) actual or constructive knowledge of the danger that ultimately caused the injury, and (3) the opportunity to prevent the injury.

13. **Contractors and Subcontractors: Independent Contractor.** In examining the right of control in an employment relationship with that of an independent contractor, it is important to distinguish control over the means and methods of the assignment from control over the end product of the work to be performed. Control over the work sufficient to impose liability on a general contractor or owner must manifest in an ability to dictate the way the work is performed, and not merely include powers such as a general right to start and stop work, inspect progress, or make suggestions that need not be followed.

14. **Contracts: Contractors and Subcontractors.** In examining whether an owner or a general contractor exercises control over the work, both the language of any applicable contract and the actual practice of the parties should be examined.

15. **Contracts: Liability.** As a rule, in a contract, general language requiring compliance with government regulations does not establish vicarious liability.

16. **Negligence: Words and Phrases.** A special risk is one that is different from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community.

17. **Negligence: Independent Contractor: Contractors and Subcontractors: Motor Vehicles: Presumptions.** The risks attendant to the operation of a vehicle are precisely the risks that the employer of an independent contractor is justified in presuming that the contractor will act to avoid.

18. **Employer and Employee: Contractors and Subcontractors: Motor Carriers.** Under the plain language of "employee" and "employer," a registered motor carrier that is also an employer of the drivers of its commercial motor vehicles cannot at the same time be the statutory employee of another motor carrier acting as a general contractor for a particular job.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Affirmed.

Kent A. Schroeder, of Ross, Schroeder & George, L.L.C., for appellant.

Robert S. Keith and Alexis M. Wright, of Engles, Ketcham, Olson & Keith, P.C., for appellee Werner Construction, Inc.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.
## I. NATURE OF CASE
The employee of a registered motor carrier caused an accident while returning the motor carrier's truck after delivering the last load of the day under a contract between the motor carrier and a general contractor, also a registered motor carrier, to haul away construction debris. The injured party's representative sued the driver, the motor carrier who employed the driver, and the general contractor. The court granted summary

judgment for the general contractor. At issue is whether, viewing the evidence in a light most favorable to the plaintiff, our statutory scheme regulating intrastate motor carriers imputes an employer-employee relationship between the general contractor and the subcontracting motor carrier's employee for purposes of vicarious liability under respondeat superior. Also at issue is whether the general contractor could be held liable under one of the recognized common-law exceptions to a general contractor's nonliability for the acts or omissions of an independent contractor.

## II. BACKGROUND

On June 7, 2012, Hazel N. Cruz, a minor child, was injured in an automobile accident caused by Lyle J. Carman. Carman was an employee of Lopez Trucking and, at the time of the accident, was driving a dump truck owned by Carlos J. Lopez, doing business as Lopez Trucking. Testing conducted following the accident revealed that Carman was operating his vehicle under the influence of the controlled substances amphetamine and methamphetamine.

Edgar Cruz, as father and next friend of Hazel, sued Carman for negligence, seeking recovery of medical expenses. Cruz joined Lopez, as the sole owner of Lopez Trucking, on the theory of imputed liability as Carman's employer, alleging that "[a]t all times relevant hereto, Carman was driving the . . . dump truck on June 7, 2012, in the course of his employment and with the permission of Lopez."

Cruz also joined Werner Construction, Inc. (Werner), the general contractor for a project that Lopez Trucking had been contracted to do hauling work for. On the day of the accident, Carman had been hauling debris away from the construction site pursuant to Lopez Trucking's oral agreement with Werner, but he had delivered his last load for the day and was returning the truck to where Lopez directed him to park it for the night. Cruz sued Werner on the theories that Werner was in complete and exclusive control over the vehicle Carman was driving or

that Carman was Werner's "'statutory employee'" pursuant to Neb. Rev. Stat. § 75-363 (Cum. Supp. 2012). Cruz alleged that Werner was negligent in failing to follow safety rules to determine Carman's qualifications and whether he was drug free, in compliance with Werner's drug-free workforce policy and federal regulations, as well as in failing to ensure that Lopez Trucking had Carman submit to a preemployment drug test. Cruz did not allege that the accident occurred on premises over which Werner had control.

Werner denied liability for the accident and moved for summary judgment. The evidence presented at the summary judgment hearing was largely undisputed. When the accident occurred, Carman was driving a dump truck categorized as a commercial motor vehicle owned by Lopez, doing business as Lopez Trucking. Lopez Trucking possessed and was operating under a U.S. Department of Transportation (DOT) motor carrier identification number. The Federal Motor Carrier Safety Administration found Lopez Trucking to be in violation of 49 C.F.R. § 382.305 (2011) of the Federal Motor Carrier Safety Regulations, which requires employers to implement a random controlled substances and alcohol testing program for their employees. Lopez Trucking was fined for the violation.

As alleged in Cruz' complaint and admitted by Werner, Carman was an employee of Lopez Trucking. He was paid an hourly wage by Lopez Trucking, which withheld taxes and provided Carman with workers' compensation insurance.

Lopez Trucking had been hired by Werner to haul debris from a construction site located on Interstate 80, for what was referred to as the "I-80 Air Park West Junction US-77 Project" (Air Park project). Lopez, Carman, and another driver who worked for Lopez Trucking drove Lopez Trucking dump trucks for the hauling job at the Air Park project.

Werner is also a registered commercial motor carrier with a DOT number. The Federal Motor Carrier Safety Administration did not conduct an investigation of Werner in relation to the accident.

### 1. Unsigned Lease Agreement

Cruz entered into evidence a lease agreement which listed Werner as lessor and Lopez as lessee, but the agreement was dated approximately 1 year before Lopez Trucking worked on the Air Park project. Further, it was signed only by Werner's president, not by Lopez. Lopez testified that he had never seen the agreement.

The agreement stated that Werner was leasing a dump truck for hauling on its construction projects. It specified the hourly rate, that Lopez would not be allowed to purchase fuel at the asphalt plant, that he would be required to fully fill out one "Lease Driver Report" per day, that Lopez must have at least $1 million in liability insurance, that Lopez would use and possess the equipment in compliance with all applicable laws, that Lopez would permit the equipment to be operated only by persons experienced in the use and operation thereof, and that he would not permit any insignia, lettering, safety warnings, or instructions on the equipment to be removed or defaced. An indemnification provision in the agreement provided that Lopez would assume the entire responsibility and liability for damages or injury to all persons and property connected with the use or care of the leased equipment.

### 2. Testimony of Lopez

Lopez testified that he had an oral agreement with Werner for work at the Air Park project and that it was not a lease agreement. He admitted, however, that the unsigned lease agreement accurately reflected their oral agreement with respect to the hourly rate and the requirement that Lopez Trucking obtain a liability policy of not less than $1 million. Lopez explained that this hourly rate compensated him for the maintenance and fuel for his dump trucks, which were entirely the responsibility of Lopez Trucking.

Lopez elaborated that the job at the Air Park project involved hauling millings from the construction site to a plant in Milford, Nebraska. Lopez testified that at the end of each

day, Werner's foreman for the Air Park project would let him know how many trucks to deliver to the jobsite the next day. Werner's supervisor at the milling machine would also tell Lopez each day when Lopez' trucks were no longer needed. No one directed Lopez as to the specific route he must take in driving between the construction site and the Milford plant.

Furthermore, Lopez explained that he was under no obligation to haul for Werner on any given day, or to haul a minimum number of loads, and Lopez was free to dictate his own schedule and that of his employees. Each day Lopez told Carman what to do, where to go, and when to do it. At no time was Carman, Lopez, or Lopez Trucking authorized by Werner to operate under Werner's DOT number.

### 3. Testimony of Werner's Project Manager, Julie Budnick

Julie Budnick, Werner's project manager, described that usually when Werner contracted with Lopez Trucking or similar contracts, it needed the trucks to supplement Werner's fleet only for short periods of time. There were no written agreements in such situations. Budnick testified that Werner would call and tell the trucking company that Werner "need[s] a couple of trucks" and that "then they are free to do whatever they want to do."

She explained that "these trucks have no obligation to work for us." Such trucks do not "want to necessarily commit"; "they want to go anywhere they want to go for the highest pay they can get." Lopez had worked for Werner in this capacity on other jobs in the past.

Budnick testified that on jobs like the Air Park project where they call in a few extra trucks, Werner does not need to tell the drivers what to do when they arrive. "They all just get in line, back up to the mill . . . get a load, drive it out, dump it, drive back, get a second load. Take a circle, drive, dump those millings, come back." She said, "They don't have to be told anything, but that, you know, when they get to the end, they're

done, go home or — or leave, we don't need you anymore for today."

At one point, Budnick was handed a copy of the unsigned lease agreement and answered in the affirmative that it was the lease agreement that Werner had with Lopez. But she later explained that she did not believe the lease agreement applied to Lopez, because it was authored for situations where drivers are using Werner's equipment. Budnick indicated that the lease agreement was used only when other truckers were pulling Werner trailers. She said that the lease agreement presented to her "doesn't even apply because we're not ren- — we're not controlling, we're not using his equipment at all, he's not using our equipment." Budnick testified that Lopez "controls his own equipment, he maintains it, he fuels it, insures it. He can just come and go as he pleases."

Under the bid proposal for the Air Park project, Werner had agreed to comply with all applicable federal, state, and local laws governing safety, health, and sanitation; provide all safeguards, safety devices, and protective equipment; and take any other needed actions that Werner or the state highway administration's contracting officer may determine to be reasonably necessary in connection with the performance of work covered by the contract to protect property, the life and health of employees on the job, and the safety of the public. Budnick testified that Werner had a drug testing policy, but that such policy would not have been applicable to Carman, because he was not Werner's employee.

### 4. Testimony of Carman

Carman testified that at the beginning of each day, he received instructions from Lopez regarding the work to be performed. Beginning on May 29, 2012, and continuing until the day of the accident, Carman had been directed to haul debris from the Air Park project.

Carmen would pick up Lopez Trucking's truck at a truckstop, go to the construction site, and then travel between the

construction site and the Milford plant until he was done for the day. Carman would then return the truck to the truckstop. Carman also fueled the truck at the truckstop under Lopez Trucking's account.

Carmen testified that while working on the Air Park project, he continued to receive his instructions from Lopez. He could not recall any representatives from Werner telling him what to do.

Carman kept track of the hours he worked for Lopez Trucking in a calendar that he kept in the truck. Additionally, during his final load at the end of each day, or sometimes the following morning, Carman would give a Werner employee his "unload sheet." The sheets are found in the record and are entitled "Werner Construction Lease Driver Report[s]."

The forms appear to require the date, name of the trucking company, beginning time, ending time, truck number, trailer number, load time, unload time, starting location, ending location, material hauled, load or ticket number, delays encountered, Werner fuel added, Werner oil added, other Werner-owned purchases, the driver's signature, and the signature of the foreman or plant manager. However, Carman filled out only the date, "Carlos Lopez" as the trucking company, the truck number, the beginning and ending time, the starting and ending location, and the material hauled. These were signed by Carman and Werner's plant manager.

The ending location listed in the driver reports was always the Milford plant. At the time of the accident, the truck Carman was driving had already made its last run to the Milford plant to unload the millings. Carlos was driving the empty truck back to the truckstop to park it for the evening.

### 5. ORDER OF SUMMARY JUDGMENT

The court granted Werner's motion for summary judgment on the ground that it had not breached any duty in relation to the accident.

The court found the evidence undisputed that Lopez Trucking had an independent contractor agreement with Werner to provide trucking services but did not lease its dump truck to Werner. The court considered the 10 factors distinguishing an employment relationship from that of an independent contractor[1] and concluded that "while a couple of the factors may auger in favor of [Cruz'] claim given the standard of review, the facts overwhelming[ly] establish support [for] the finding [of] an independent contractor status in this case."

The court concluded, further, that under the Federal Motor Carrier Safety Regulations adopted by § 75-363, there was no material issue of fact that Lopez Trucking, rather than Werner, was operating as the motor carrier with respect to Carman and that Lopez Trucking, not Werner, was the employer of Carman.

Finally, viewing the evidence in a light most favorable to Cruz, the court found no evidence that would support the conclusion that Werner had exercised substantial control over Lopez Trucking's work or that the accident involved the breach of any nondelegable duty. Thus, Cruz had failed to demonstrate a genuine issue that Werner was vicariously liable for Carman's negligence under exceptions to the general rule that a general contractor is not liable for the negligence of an independent contractor.

Cruz' complaint as to Werner was dismissed. Subsequently, Cruz moved for summary judgment against Lopez and Carman, which the court granted, noting that there were no further issues remaining before the court. On appeal from the judgment, Cruz appeals the order of summary judgment in favor of Werner.

### III. ASSIGNMENTS OF ERROR

Cruz assigns, consolidated and restated, that the district court erred in granting summary judgment in favor of Werner

---

[1] See, e.g., *Mays v. Midnite Dreams*, 300 Neb. 485, 915 N.W.2d 71 (2018).

on the ground that there was no material issue of fact that (1) Carman was not a "common law employee" of Werner, (2) Carman was not a statutory employee of Werner pursuant to the Federal Motor Carrier Safety Regulations, and (3) Werner did not breach a nondelegable duty to Cruz.

## IV. STANDARD OF REVIEW

[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, giving that party the benefit of all reasonable inferences deducible from the evidence.[2]

[2] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[3]

## V. ANALYSIS

[3] In order to recover in a negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages.[4] Cruz alleged in his complaint and asserts on appeal that Werner was negligent in failing to ensure that Carman was subjected to pre-employment drug testing consistent with 49 C.F.R. § 382.301 (2011). Summary judgment was granted in favor of Werner on the ground that Werner did not have a duty to ensure that Lopez Trucking's employees were drug free.

[4,5] We agree that there was no material issue of fact preventing summary judgment in favor of Werner on the ground that Werner did not breach any duty relating to Carman's negligence that caused the accident. The question whether a legal duty exists for actionable negligence is a question

---

[2] *Christensen v. Gale, ante* p. 19, 917 N.W.2d 145 (2018).

[3] *Id.*

[4] *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014).

of law dependent on the facts in a particular situation.[5] The mere existence of some alleged factual dispute between the parties, however, will not defeat an otherwise properly supported motion for summary judgment[6]; only disputes over facts that under the governing law might affect the outcome of the suit will properly preclude the entry of summary judgment.[7]

[6,7] Under the doctrine of respondeat superior, an employer is held vicariously liable to third persons for the employee's negligence in the course of the employer's business.[8] Conversely, one who employs an independent contractor is generally not liable for physical harm caused to another by the acts or omissions of the contractor or its servants.[9] This is because an employer of an independent contractor generally has no control over the manner in which the work is to be done by the contractor, so the contractor, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk and bearing and distributing it.[10]

Cruz argues, albeit somewhat vaguely, that Carman had an employee relationship with Werner rather than the relationship of an independent contractor. Cruz relies more on an argument that one of the exceptions to a general contractor's nonliability for the acts or omissions of an independent contractor applies. Alternatively, Cruz argues that our statutory scheme

---

[5] *Id.*

[6] *Anderson v. Service Merchandise Co.*, 240 Neb. 873, 485 N.W.2d 170 (1992).

[7] *Id.*

[8] See *Rodriguez v. Catholic Health Initiatives*, 297 Neb. 1, 899 N.W.2d 227 (2017).

[9] See, *Rodriguez v. Surgical Assocs.*, 298 Neb. 573, 905 N.W.2d 247 (2018); *Gaytan v. Wal-Mart, supra* note 4; *Eastlick v. Lueder Constr. Co.*, 274 Neb. 467, 741 N.W.2d 628 (2007).

[10] *Rodriguez v. Surgical Assocs., supra* note 9; *Gaytan v. Wal-Mart, supra* note 4.

regulating intrastate motor carriers[11] imputes an employer-employee relationship between Werner and Carman for purposes of vicarious liability under respondeat superior.

### 1. Employee Versus Independent Contractor

We first address whether there was a common-law employment relationship. Cruz does not clearly argue how, under the 10 factors for determining whether one performs services for another as an employee or as an independent contractor,[12] he presented a material issue of fact that Carman was Werner's employee. Those factors are (1) the extent of control which, by the agreement, the employer may exercise over the details of the work; (2) whether the one employed is engaged in a distinct occupation or business; (3) the type of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business.[13]

[8] Ordinarily, a party's status as an employee or an independent contractor is a question of fact. However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law.[14] We find that under the facts presented,

---

[11] See Neb. Rev. Stat. §§ 75-362 to 75-369.07 (Reissue 2009 & Cum. Supp. 2012).

[12] See *Mays v. Midnite Dreams, supra* note 1.

[13] *Id.*

[14] *Id.*

the question whether Carman was an employee of Werner was properly determined as a matter of law.

Cruz points to the district court's language that "a couple of the factors may auger in favor of [Cruz'] claim given the standard of review" and argues that the district court thus indicated it was inappropriately making a factual determination on summary judgment. Whether the court did so does not affect the outcome of this appeal, because the question whether he presented a material issue of fact is a question that we determine independently of the court below.[15] The grant of a motion for summary judgment may be affirmed on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon.[16]

In any event, though the language used by the district court was not ideal, it was meant to convey that, viewing the evidence in a light most favorable to Cruz, he demonstrated only "a couple" of the 10 factors could possibly weigh in favor of an employer-employee relationship. Even considering those "couple" of factors, the court concluded that the clear overall inference was that Carman was not Werner's employee.

We agree. Most of the factors are simply not a good fit for an analysis of whether the negligent party, undisputedly an employee of another employer, was somehow at the same time an employee of the general contractor. For example, Carman was paid hourly, but he was paid by Lopez Trucking, not by Werner. Carman was an employee, but the relevant question is whether he was Werner's employee. Cruz did not allege that Carman was a borrowed servant.[17]

With this in mind, the factors overwhelmingly demonstrate the relationship of an independent contractor. Werner did not supply the instrumentalities for the work, the "job" was for a limited length of time, and the parties did not believe they were

---

[15] See *Farmland Serv. Co-op v. Southern Hills Ranch*, 266 Neb. 382, 665 N.W.2d 641 (2003).

[16] *Olson v. Wrenshall*, 284 Neb. 445, 822 N.W.2d 336 (2012).

[17] See, e.g., *Barton v. Hobbs*, 181 Neb. 763, 151 N.W.2d 331 (1967).

creating an agency relationship. The only factor that could under these circumstances indicate an employer-employee relationship is control. As will be explained further below, even viewing the evidence in a light most favorable to Cruz, the level of control demonstrated by Cruz would be insufficient to establish vicarious liability.

## 2. Exceptions to Nonliability for Independent Contractor's Negligence

[9,10] Cruz argues that he presented a material issue of fact concerning the applicability of one of the exceptions to the general contractor's nonliability for the negligence of its independent contractors. Our case law has recognized four exceptions to the general rule that one who employs an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or its servants.[18] Specifically, we have held that an employer of an independent contractor can be liable for physical harm caused to another if (1) the employer retains control over the contractor's work, (2) the employer is in possession and control of premises where the injury occurred, (3) a statute or rule imposes a specific duty on the employer, or (4) the contractor's work involves special risks or dangers.[19] We often refer to the latter three exceptions as involving "nondelegable" duties.[20] A nondelegable duty means that an employer of an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed.[21]

### (a) Control of Relevant Work

[11,12] Cruz primarily argues that the first exception applies; i.e., that Werner had control over the relevant work and is

---

[18] *Gaytan v. Wal-Mart, supra* note 4.

[19] See, *id.*; *Didier v. Ash Grove Cement Co.*, 272 Neb. 28, 718 N.W.2d 484 (2006).

[20] *Gaytan v. Wal-Mart, supra* note 4.

[21] *Id.*

therefore liable for a failure to exercise reasonable care in the use of that control.[22] To fall within this exception to the general rule of nonliability, the general contractor's involvement in overseeing the work must be substantial.[23] Furthermore, that control must directly relate to the work that caused the injury.[24] In other words, the key element of control must exist with respect to the very thing from which the injury arose.[25] To impose liability on a property owner or general contractor for injury to an independent contractor's employee based upon the owner's retained control over the work, the owner or general contractor must have (1) supervised the work that caused the injury, (2) actual or constructive knowledge of the danger that ultimately caused the injury, and (3) the opportunity to prevent the injury.[26]

[13] In examining the right of control in an employment relationship with that of an independent contractor, it is important to distinguish control over the means and methods of the assignment from control over the end product of the work to be performed.[27] Control over the work sufficient to impose liability on a general contractor or owner must manifest in an ability to dictate the way the work is performed, and not merely include powers such as a general right to start and stop work, inspect progress, or make suggestions that need not be followed.[28]

[14] In examining whether an owner or a general contractor exercises control over the work, both the language of any applicable contract and the actual practice of the parties should

---

[22] See *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997).

[23] See *Gaytan v. Wal-Mart, supra* note 4.

[24] See *id.*

[25] *Cutlip v. Lucky Stores*, 22 Md. App. 673, 325 A.2d 432 (1974).

[26] See *Gaytan v. Wal-Mart, supra* note 4.

[27] See, *Harris v. Velichkov*, 860 F. Supp. 2d 970 (D. Neb. 2012); *Gaytan v. Walmart, supra* note 4.

[28] *Gaytan v. Wal-Mart, supra* note 4.

be examined.[29] Cruz points to the provisions of the lease agreement whereby (1) Werner agreed to pay Lopez by the hour, (2) Lopez was prohibited from purchasing fuel at the asphalt plant, (3) Lopez' drivers were required to turn in one "Lease Driver Report" per day, (4) Werner agreed to use and possess the truck in compliance with all applicable laws, and (5) Werner was to return the truck to Lopez at the end of the lease. Further, Cruz relies on the acts of Werner agents in (1) determining what days Lopez' trucks were to report to work, (2) directing that the trucks were to report to work at the milling machine site, (3) directing the trucks to haul the milling to the asphalt plant, and (4) requiring a "Lease Driver Report" to be turned in for each day of hauling.

Even viewing the evidence in a light most favorable to Cruz and assuming that the lease agreement, unsigned by Lopez, evidences some of the terms of the parties' oral agreement, the control in their agreement and the parties' actual practice is insufficient as a matter of law to establish the requisite substantial control over Lopez Trucking and Carman's work. It was undisputed that Werner never had possession of Lopez Trucking's dump truck that was driven by Carman. Furthermore, the evidence was undisputed that Lopez Trucking and its employees were under no obligation to haul on any given day or to haul a specific number of loads. Lopez Trucking and Carman were not told by Werner to haul at a specific time other than to inform them when they were no longer needed for the day. The process of picking up loads and dumping them was largely self-explanatory. Werner's control concerned the end product of hauling debris from the construction site to the Milford plant. Werner did not otherwise control Lopez Trucking's drivers' means and methods. Werner did not tell Lopez Trucking or its drivers what route to take in reaching the construction site or the Milford plant.

---

[29] *Id.*

[15] Furthermore, the evidence presented failed to create an issue of fact that any control by Werner extended to the very thing from which the injury arose.[30] The evidence was undisputed that Werner did not participate in the decision to hire Carman and did not control whether Lopez Trucking's drivers were tested for drugs. Cruz presented no evidence that Werner's employees should have observed Carman's impaired driving. The only indication of any control pertinent to the accident is the provision of the unsigned lease that Lopez Trucking would use and possess the equipment in compliance with all applicable laws. Leaving aside that this referred to Werner's equipment and not Lopez Trucking's, as a rule, such general language requiring compliance with government regulations does not establish vicarious liability.[31]

Viewing the evidence in the light most favorable to Cruz and giving him the benefit of all reasonable inferences deducible from the evidence, Cruz did not demonstrate substantial control over the work that caused the injury. Thus, as a matter of law, Werner was not liable for the negligence of Lopez Trucking or Carman under the control-over-the-work exception to the general rule that an employer of an independent contractor can be vicariously liable for physical harm caused to another.

### (b) Nondelegable Duty

Cruz also asserts that Werner had a "nondelegable contractual duty pursuant to the awarded contract" to conduct a drug test on Carman.[32] Cruz does not argue under the nondelegable duties heretofore recognized by this court that (1) Werner

---

[30] *Cutlip v. Lucky Stores, supra* note 25.

[31] See, e.g., *North American Van Lines, Inc. v. N.L.R.B.*, 869 F.2d 596 (D.C. Cir. 1989); *Howarton v. Minnesota Mining and Mfg., Inc.*, 133 S.W.3d 820 (Tex. App. 2004); *Vega v. Griffiths Const., Inc.*, 172 Ariz. 46, 833 P.2d 717 (Ariz. App. 1992).

[32] Brief for appellant at 11.

was in possession and control of premises where the injury occurred, (2) Werner breached a specific duty imposed by a statute or rule, or (3) Carman's work involved special risks or dangers.[33]

Instead, Cruz again points out that Werner agreed in its bid proposal for the Air Park project that Werner would comply with all applicable federal, state, and local laws governing safety, health, and sanitation; provide all safeguards, safety devices, and protective equipment; and take any other needed actions reasonably necessary to protect the life and health of employees on the job and the safety of the public in connection with the performance of the work covered by the project. Cruz does not cite to any law establishing that contractual obligations somehow create nondelegable duties as to all the things agreed to in the contract. We can find no support for such a proposition and find it to be without merit.

Cruz relies on *Parrish v. Omaha Pub. Power Dist*,[34] apparently as part of the contract argument. However, the facts of that case are inapposite. *Parrish* involved the death of a subcontractor's employee after a fall from the building where the construction work was being performed. We held that if the owner of the premises maintained possession and control of the construction site and the general contractor assumed a contractual duty for the safety of workers at that construction site, then both the owner and the general contractor had a nondelegable duty to use reasonable care to keep the premises in a safe condition for the subcontractor's employees or other invitees to work while the contract is in the course of performance.[35] Cruz did not allege in his complaint, nor did he present sufficient evidence to establish, an issue of fact that

---

[33] See *Gaytan v. Wal-Mart, supra* note 4.

[34] *Parrish v. Omaha Pub. Power Dist.*, 242 Neb. 783, 496 N.W.2d 902 (1993), *disapproved, Gaytan v. Wal-Mart, supra* note 4.

[35] See *id.* See, also, *Simon v. Omaha P. P. Dist.*, 189 Neb. 183, 202 N.W.2d 157 (1972).

the accident occurred on premises over which Werner maintained possession and control.

[16] Finally, Cruz suggests that the empty dump truck being driven by Carman at the time of the accident presented a special risk or danger. We find no merit to that suggestion. A special risk is one that is different from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community.[36] It must involve some special hazard resulting from the nature of the work done.[37] We have long held that operating motor vehicles is not an inherently dangerous activity.[38] And, in *Kime v. Hobbs*,[39] we held that the transportation of cattle in a tractor-livestock trailer was not an inherently dangerous activity such that it imposes a nondelegable duty on the employer of an independent contractor. In doing so, we observed that only in special circumstances have courts held that the operation of a "loaded truck" presented a peculiar risk so as to impose a nondelegable duty.[40]

[17] The dump truck Carman was driving was empty. The truck driven by Carman thus presented even less of a special hazard than the loaded trailer at issue in *Kime*. It is not distinguishable in a way that could lead this court to a different conclusion as to whether it presented a peculiar risk. Without diminishing the gravity of the underlying negligence, the risk that a driver could be impaired is, in a legal sense, an "ordinary" risk attendant to the operation of a motor vehicle. As we stated in *Kime*, the risks attendant to the operation of a vehicle are precisely the "risks that the employer of an

---

[36] See *Kime v. Hobbs, supra* note 22.

[37] See *id.*

[38] See, *Bridgeford v. U-Haul Co.*, 195 Neb. 308, 238 N.W.2d 443 (1976); *Christensen v. Rogers*, 172 Neb. 31, 108 N.W.2d 389 (1961).

[39] See *Kime v. Hobbs, supra* note 22.

[40] See *id.* at 417, 562 N.W.2d at 713, citing, e.g., *Ek v. Herrington*, 939 F.2d 839 (9th Cir. 1991) (holding that transportation of logs did not generally pose peculiar risk of harm).

independent contractor is justified in presuming that the contractor will act to avoid."[41] We conclude that the evidence failed to present a material issue of fact concerning a breach of a nondelegable duty.

### 3. Statutory Employee Under Federal Motor Carrier Safety Regulations

Finally, we turn to Cruz' argument that Carman was a statutory employee under the regulatory scheme governing intrastate commerce. Through § 75-363, the Nebraska Legislature adopted several parts of the Federal Motor Carrier Safety Regulations as Nebraska law, making them applicable to carriers, drivers, and vehicles to which the federal regulations apply, as well as to certain vehicles of intrastate motor carriers. The purpose of extending the regulations to certain vehicles of intrastate motor carriers was to ensure that motor carriers not falling under federal jurisdiction were nonetheless subject to regulation under state law.[42] The statutory scheme governing intrastate motor carriers was designed to

> promote uniformity of regulation, to prevent motor vehicle accidents, deaths, and injuries, to protect the public safety, to reduce redundant regulation, to promote financial responsibility on the part of all motor carriers operating in and through the state, and to foster the development, coordination, and preservation of a safe, sound, adequate, and productive motor carrier system which is vital to the economy of the state.[43]

For purposes of §§ 75-362 to 75-369.07, the definition of "[e]mployee" is:

> [A]ny individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle

---

[41] *Kime v. Hobbs, supra* note 22, 252 Neb. at 418, 562 N.W.2d at 713.

[42] See *Caspers Constr. Co. v. Nebraska State Patrol*, 270 Neb. 205, 700 N.W.2d 587 (2005).

[43] Neb. Rev. Stat. § 75-301(1) (Reissue 2009).

safety. Such term includes a driver of a commercial motor vehicle, including an independent contractor while in the course of operating a commercial motor vehicle, a mechanic, and a freight handler.[44]

An "[e]mployer" is defined as "any person engaged in a business affecting commerce who owns or leases a commercial motor vehicle in connection with that business or assigns employees to operate it."[45] "Motor carrier" is defined as

a for-hire motor carrier or a private motor carrier. The term includes a motor carrier's agents, officers, and representatives as well as employees responsible for hiring, supervising, training, assigning, or dispatching of drivers and employees concerned with the installation, inspection, and maintenance of motor vehicle equipment or accessories. This definition includes the terms employer and exempt motor carrier.[46]

These definitions are identical to the definitions found in the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 390.5 (2011).

For certain motor carriers operating in intrastate commerce, § 75-363 at the time of the accident, adopted parts 382, 385 through 387, 390 through 393, and 395 through 398 of title 49 of the Code of Federal Regulations in existence as of January 1, 2012.[47] There is no dispute that the truck involved in the accident here at issue was operated by a motor carrier governed by these sections. Both Werner and Lopez Trucking are motor carriers operating each under their own DOT numbers.

The Federal Motor Carrier Safety Regulations generally require that a commercial motor carrier operate only if registered, and such registration requires proof of financial

---

[44] § 75-362(11) (now found at § 75-362(12) (Cum. Supp. 2016)).

[45] § 75-362(12) (now found at § 75-362(13) (Cum. Supp. 2016)).

[46] § 75-362(29) (now found at § 75-362(31) (Cum. Supp. 2016)).

[47] See § 75-363(1) and (3)(a) through (l).

responsibility in order to ensure collectability of a judgment against the motor carrier.[48] Several provisions of the regulations were specifically designed to prevent regulated motor carriers from evading the requirements of the regulatory scheme through lease agreements nominally designating as independent contractors owners/drivers who were underinsured and unregulated.[49] These regulations protect the public and provide financial responsibility for motor carrier accidents by creating a legal right and duty to control leased vehicles operated for the regulated motor carrier's benefit as if they were the owners of such vehicles.[50]

But most of these provisions preventing evasion of the regulatory scheme through use of independent contractors are found in 49 C.F.R. § 376 (2011), which the Legislature did not adopt. Specifically, 49 C.F.R. § 376.11 (2011) of the unadopted regulations states that "the authorized carrier may perform authorized transportation in equipment it does not own only under" several conditions, including that "[t]here shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.12."[51] And, 49 C.F.R. § 376.12(c)(1) (2011), in turn, requires that the lease shall be signed and provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment, and responsibility for its operation for the duration of the lease.

---

[48] See, 49 U.S.C. §§ 13901 and 13906 (2012); *Harris v. Velichkov, supra* note 27.

[49] See, *American Trucking Assns. v. U.S.*, 344 U.S. 298, 73 S. Ct. 307, 97 L. Ed. 337 (1953); *Crocker v. Morales-Santana*, 854 N.W.2d 663 (N.D. 2014); *Illinois Bulk Carrier, Inc. v. Jackson*, 908 N.E.2d 248 (Ind. App. 2009).

[50] See, 49 U.S.C. § 14102(a)(4) (2012); *Tamez v. Southwestern Motor Transport, Inc.*, 155 S.W.3d 564 (Tex. App. 2004); *Crocker v. Morales-Santana, supra* note 49.

[51] 49 C.F.R. § 376.11(a).

Under these regulations, the holder of a highway permit is liable for the negligent operation of a motor vehicle leased from one not authorized to transport passengers or goods over the public highways, and operated under the former's permit—even though the owner of the vehicle is an independent contractor and liable for the driver's conduct.[52] Most federal courts hold that 49 C.F.R. § 376.12(c)(1) creates a rebuttable presumption of an agency relationship between the carrier-lessee and the driver.[53]

In arguing that under 49 C.F.R. §§ 350 to 399 (2011), a lessee such as Werner is vicariously liable for the driver of its "leased" vehicle, Cruz ignores the fact that these provisions are not contained in the sections adopted by § 75-363 into Nebraska law governing intrastate motor carriers. The only provisions Cruz can possibly rely upon for vicarious liability under the regulations are the definitions of employee and employer.

Before addressing those definitions, however, we note that we have never addressed the applicability of the definitions found in § 75-362 and the regulations adopted by § 75-363 to our state tort law. Neither chapter 75 of the Nebraska Revised Statutes nor the Federal Motor Carrier Safety Regulations address state tort liability. Indeed, the Interstate Commerce Commission, the predecessor to the Federal Motor Carrier Safety Administration,[54] has commented that "[t]he Commission did not intend that its leasing regulations would supersede

---

[52] 8 Am. Jur. 2d *Automobiles* § 714 (2017).

[53] See, *Delaney v. Rapid Response, Inc.*, 81 F. Supp. 3d 769 (D.S.D. 2015); *UPS Ground Freight, Inc. v. Farran*, 990 F. Supp. 2d 848 (S.D. Ohio 2014); *Thomas v. Johnson Agri-Trucking*, 802 F. Supp. 2d 1242 (D. Kan. 2011); *Bays v. Summit Trucking, LLC*, 691 F. Supp. 2d 725 (W.D. Ky. 2010). See, also, *Penn v. Virginia Intern. Terminals, Inc.*, 819 F. Supp. 514 (E.D. Va. 1993). But see, *Huggins v. FedEx Ground Package System, Inc.*, 592 F.3d 853 (8th Cir. 2010); *Zamalloa v. Hart*, 31 F.3d 911 (9th Cir. 1994).

[54] See, ICC Termination Act of 1995, Pub. L. No. 104-88, § 101, 109 Stat. 803 (abolishing Interstate Commerce Commission); 49 U.S.C. § 113 (2012).

otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist. Our regulations should have no bearing on this subject. Application of State law will provide appropriate results."[55] Nevertheless, some jurisdictions hold that the regulations adopted by the state may create a statutory employee relationship between owner-lessors and authorized motor carrier lessees, which in turn may serve to establish vicarious liability under applicable state law, when the other elements of respondeat superior have been met.[56]

We need not determine in this case whether we should likewise hold that the regulatory scheme governing intrastate motor carriers is relevant to common-law concepts of respondeat superior liability in a tort action. This is because it is apparent that even if this were so there is no statutory employer-employee relationship between Werner and Carman under the definitions found in § 75-362 and the regulations adopted by § 75-363.

[18] The regulations contemplated a relationship between registered motor carriers and private truck owners/drivers who are not registered motor carriers and who lease their services to the registered motor carriers.[57] They do not impose an

---

[55] *Lease and Interchange of Vehicles (Ident. Devices)*, 3 I.C.C.2d 92, 93 (1986).

[56] See, *Frederick v. Swift Transp. Co.*, 616 F.3d 1074 (10th Cir. 2010); *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, 39 N.E.3d 595, 396 Ill. Dec. 46 (2015); *Crocker v. Morales-Santana, supra* note 49; *Tamez v. Southwestern Motor Transport, Inc., supra* note 50. See, also, *Beavers v. Victorian*, 38 F. Supp. 3d 1260 (W.D. Okla. 2014); *Parker v. Erixon*, 123 N.C. App. 383, 473 S.E.2d 421 (1996); Patrick Phillips, Note, *Common Law Respondeat Superior Versus Federal Regulation of Motor Carrier Leases: Court Interpretation of the Interstate Commerce Commission Regulations of Motor Carrier Lease Requirements*, 24 Okla. City U.L. Rev. 383 (1999); R. Clay Porter & Elenore Cotter Klingler, *The Mythology of Logo Liability: An Analysis of Competing Paradigms of Lease Liability for Motor Carriers*, 33 Transp. L.J. 1 (2005).

[57] See Phillips, *supra* note 56.

agency relationship where the independent contractor is itself a registered motor carrier and where an employee of that motor carrier caused the accident. Under the plain language of "employee" and "employer," a registered motor carrier that is also an employer of the drivers of its commercial motor vehicles cannot at the same time be the statutory employee of another motor carrier acting as a general contractor for a particular job.[58]

Thus, in *Illinois Bulk Carrier, Inc. v. Jackson*,[59] the court held that the employee of a subcontractor that was a federally regulated motor carrier was not the statutory employee of the general contractor that was also a federally regulated motor carrier. The subcontractor in *Illinois Bulk Carrier, Inc.* operated under an oral agreement, and while the subcontractor's drivers filled out paperwork each day, they proceeded to their final destination using the route of their choice. At no time did the general contractor take possession, control, maintain, or service the subcontractor's trucks. Under these facts, the court concluded that summary judgment in favor of the subcontractor and against the injured plaintiffs seeking to impose vicarious liability was proper. The court reasoned, first, that there was no lease, because the general contractor had no right of control and never took possession of the truck involved in the accident. Second, the court concluded that under the definition in 49 C.F.R. § 390.5, an employee is an "individual," plainly meaning a human being and not a corporation or other legal person. Thus, the subcontractor, as a motor carrier, could not be an "employee" of the general contractor. Furthermore, the court observed that because the subcontractor was a motor carrier with its own DOT authorization and subject to the regulations, the circumstances were not those meant to be addressed by the statutory employee provision.[60]

---

[58] *Beavers v. Victorian, supra* note 56. See, also, e.g., *Illinois Bulk Carrier, Inc. v. Jackson, supra* note 49.

[59] *Illinois Bulk Carrier, Inc. v. Jackson, supra* note 49.

[60] *Id.*

Similarly, in *Beavers v. Victorian*,[61] the court held that a motor carrier was entitled to summary judgment against the injured third party who sought to impose vicarious liability under the regulations for the negligence of the drivers of a subcontractor motor carrier operating under its own DOT registration number. A brokerage agreement between the two carriers designated the subcontractor as an independent contractor and required it to furnish all equipment needed to provide the transportation services, to maintain the equipment in good working order, employ properly licensed and trained personnel, and comply with all applicable DOT laws and regulations. While general shipment instructions were given, the subcontractor was free to determine the route to its destination. The court held that the motor carrier who brokered the agreement with the subcontractor was not an "employer," because it neither owned nor leased the motor vehicle involved in the accident, nor assigned an employee to operate it.[62] Similarly, the subcontractor could not be the broker's "employee," because it was itself an "employer" of the driver, acting under its own motor carrier authority.[63] Such legal entity did not qualify as an "individual" employee.[64]

The court in *Harris v. Velichkov*[65] also rejected a claim that a motor carrier acting in that instance as a broker was vicariously liable for the actions of the employee of a motor carrier that contracted with it to carry the goods. The court explained that it was important to "focus on the specific transaction at issue" and not whether the entity acted as a motor carrier in other situations.[66] Further, it would produce absurd results to interpret the regulations in such a way that the motor carrier acting

---

[61] *Beavers v. Victorian, supra* note 56.

[62] See *id.*

[63] See *id.*

[64] See *id.*

[65] *Harris v. Velichkov, supra* note 27.

[66] *Id.* at 979.

in that instance as broker would be responsible for ensuring the maintenance of driver safety records and testing, when the driver motor carrier had no relationship with that driver other than through the independent contractor motor carrier.[67] The driver was an employee of the independent contractor motor carrier and not of the motor carrier who contracted with that independent contractor.[68]

The facts of the current case are similar to the facts held in *Illinois Bulk Carrier, Inc.*; *Beavers*; and *Harris* to be insufficient as a matter of law to establish a statutory employment relationship that could impose vicarious liability. Cruz wishes to impose liability on Werner for failing to ensure that random drug testing was conducted on Carman. But under a plain reading of the relevant terms, Lopez Trucking is not an "employee" of Werner. Leaving aside whether Lopez Trucking was even an "individual," an "employee" is defined as an individual "other than an employer."[69] And Lopez Trucking was, under the plain meaning of the applicable definitions, both an "employer" and a "motor carrier."[70]

The "motor carrier," with respect to the accident in question, was Lopez Trucking and not Werner. Carman, while an employee, was not Werner's employee. As such, Werner did not have the requisite control to ensure such that random drug testing was conducted on Carman. Werner contracted with a registered motor carrier, Lopez Trucking, which operated under its own DOT number and was subject to the regulations. Werner did not contract directly with Carman as an underinsured and unregulated individual owner/operator. We find no support for Cruz' suggestion that under the adopted regulations, Carman was Werner's statutory "employee."

---

[67] See *id.*

[68] See *id.*

[69] See § 75-362(11) (now found at § 75-362(12) (Cum. Supp. 2016)).

[70] See § 75-362(12) and (29) (now found at § 75-362(13) and (31) (Cum. Supp. 2016)).

Cruz attempts to rely on interpretive guidance by the Federal Motor Carrier Safety Administration in which it stated: "The term 'employee,' as defined in § 390.5, specifically includes an independent contractor employed by a motor carrier. The existence of operating authority has no bearing upon the issue."[71] Cruz fails to note that this guidance was to clarify who is responsible for compliance with federal recordkeeping when the independent contractor is an individual owner/operator with an operating authority.[72] It does not address vicarious liability in tort, and it does not address the scenario where the contract is with a motor carrier employer and the driver in question is, under any other legal principle, an employee of that motor carrier.[73]

Viewing the evidence in a light most favorable to Cruz, we determine he cannot establish that Carman was a statutory "employee" of Werner.

## VI. CONCLUSION

We find no merit to Cruz' argument that the trial court erred in granting summary judgment in favor of Werner and in dismissing Cruz' complaint as to Werner. Lopez Trucking was found liable for Carman's negligence under the doctrine of respondeat superior, and neither party disputes that result. For the foregoing reasons, we affirm the district court's order of summary judgment in favor of Werner.

Affirmed.

---

[71] Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 62 Fed. Reg. 16,370, 16,407 (Apr. 4, 1997).

[72] See *Beavers v. Victorian, supra* note 56.

[73] See *id.*