IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

YATES V. CASTO

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JOHN YATES AND DENISE YATES, APPELLANTS,

V.

STEVEN CASTO, APPELLEE.

Filed February 12, 2019.    No. A-17-1053.

Appeal from the District Court for Douglas County: HORACIO J. WHEELOCK, Judge. Affirmed.

Gail E. Boliver, of Boliver Law Firm, for appellants.

Michael S. Degan and Victoria H. Buter, of Kutak Rock, L.L.P., for appellee.

MOORE, Chief Judge, and PIRTLE and ARTERBURN, Judges.

MOORE, Chief Judge.

INTRODUCTION

John Yates and Denise Yates (collectively the Yateses) filed an action in the district court for Douglas County against their investment advisor, Steven Casto, and Security Benefit Life Insurance Co., setting forth theories of recovery for negligence and breach of fiduciary duty. The claims against Security Benefit Life Insurance were subsequently dismissed, and it is not involved in this appeal. Following a bench trial, the court entered judgment in favor of Casto. The Yateses appeal from the court's order, which denied their motion for new trial. For the reasons set forth herein, we affirm.

BACKGROUND

On December 5, 2014, the Yateses filed a complaint in the district court against Casto, setting forth theories of recovery for negligence and breach of fiduciary duty. They subsequently

- 1 -

filed an amended complaint, expanding the details of their allegations. The Yateses alleged that they both had funds to invest for their retirement and sought professional investment advice from Casto in the summer of 2009. The Yateses alleged that they had no education or training in investment planning and relied upon Casto for proper investment advice; that Casto recommended certain products of a trust company and various annuities; that Casto began the process in 2009 of purchasing and surrendering various investment products in a short period of time, incurring surrender fees and charging commissions on the new sales, which he failed to disclose; and that in May 2013, Casto surrendered annuities purchased in approximately October 2010 by one company to purchase annuities by another company. The Yateses alleged that they were damaged by Casto's various breaches of duty and they sought compensatory damages.

A bench trial was held before the district court. The court heard testimony from the Yateses and Casto as well as from an expert witness for the Yateses, and it received numerous documentary exhibits into evidence.

The evidence showed that Steven Casto is an experienced financial planner. He held securities licenses from 1999 until October 2012 when he voluntarily "shelved" or placed his licenses on hiatus for a year; they lapsed a year after that. In 2012, when he shelved his licenses, Casto set up his own registered investment advisor firm. To continue to use his previous licenses after that point, Casto would have had to have been affiliated with a broker-dealer. Casto's securities licenses were never revoked, nor was he ever asked to surrender his securities licenses. The licenses carried by Casto since 2012 permit him to operate as an investment advisor representative of his own firm and sell insurance products. Casto remained fully licensed to sell and service other products, including products such as the AVIVA annuities sold to the Yateses in 2009 and retained by them at the time of trial.

At the time of trial, John, who has a high school education, was 59 years old and Denise was 52. Denise has a bachelor's degree in human resource management and was employed by Woodmen of the World Life Insurance as a senior project manager in "IT."

In 2009 when the Yateses sought investment advice from Casto, Denise had recently inherited some money and John was considering taking early retirement from the U.S. Postal Service. The Yateses each testified that they did not have any education or experience in portfolio management. The Yateses wanted to invest Denise's inherited funds and money from John's early retirement to provide them with future retirement income. At that time, the Yateses' investment goals were preservation of principal and growth of their investment for future retirement income. Casto collected information from the Yateses to assess their investment goals and risk tolerance and discussed various investment options with them. The record also shows that each time the Yateses purchased investment products based on Casto's recommendations, he met with them; ascertained their financial situation and goals, risk tolerance, and investment preferences; and advised them about product features, risks, and options.

Initially in July 2009, the Yateses opened three Trust Company of America (Trust Company) accounts (investing $26,249, $92,576, and $184,921) and purchased two AVIVA annuity products (investing $105,312 and $117,002) recommended by Casto. The Yateses both testified that they were happy with their original investments. Casto testified that the asset allocation between bonds and stocks in the initial products purchased by the Yateses was

appropriate at the time based on what they had told him. The Yateses' expert also believed that the asset allocation within these initial products was appropriate.

There was evidence at trial about the commissions and fees received by Casto on the various products sold to the Yateses. On the Trust Company products sold in 2009, Casto charged a management fee of "1 percent of the amounts in the Trust," but he charged "[n]othing" on the AVIVA contracts; rather, on the annuity products, he was paid by the annuity company a percentage (3½ - 4%) up front. Casto testified that while he never told the Yateses the amount of the commission received on the AVIVA products, he told them that he was paid by the company.

Although John testified that the Yateses' financial goal of wanting "growth in [their] retirement accounts" never changed, according to Casto, the Yateses communicated to him in 2010 that their financial goals and objectives had changed and they wanted to preserve the gains made by their initial investments. Casto recalled that the Yateses were becoming more conservative and were concerned that the market might be heading into a downturn similar to what happened in 2008. When asked if their investment objectives changed "to preserve capital and go conservatively moderate" on risk tolerance, John testified that he did not "recall specifically that [they] made those changes." However, John admitted that he personally signed and initialed the form changing his investment objective to "capital preservation" and his risk tolerance preference to "moderately conservative."

According to Casto, at the point when the Yateses first invested, the market was rebounding and their investments had "enjoyed a nice run-up in their initial setup." Casto testified that, moving forward, the Yateses wanted to make sure that they did not "take big losses if the market went down" and that they wanted to "take some money off the table" to "protect the run-up that they had enjoyed." Casto counseled them not to overreact, explaining that the market "functions up and down." However, the Yateses remained concerned about exposure in the marketplace and directed Casto to "find something that would help protect [their investments] at the time that the market was not looking very good." When asked at trial whether he was worried about the market in 2010, John responded, "Beyond normal conversation just -- I mean the markets go up, markets go down, but not -- not really." He testified that his market concern did not have anything to do with why the Yateses purchased products recommended by Casto in 2010.

At some point in 2010, Casto suggested a range of options and made recommendations to the Yateses. His suggestions included the option of moving to a more conservative portfolio in the Trust Company accounts. Casto also discussed the option of another annuity purchase, given that one of the advantages of an annuity is that it provides a floor of protection against losing principal. The Yateses decided to purchase another annuity, and Casto recommended Jackson National Life, which offered a variable annuity that allowed internal allocations in fixed income products but also provided flexibility to allow the funds to be exposed to the market. In September 2010, the Yateses purchased two Jackson National annuity products recommended by Casto with funds transferred from the Trust Company accounts. The 100 percent fixed income selection within these annuities, which was made by the Yateses at the time of purchase, could have been changed by them at any time.

In July 2011, the Yateses purchased a "Jackson Roth annuity" recommended by Casto with funds rolled over from other products. The form completed for the purchase of this annuity shows that John initialed the box next to "CAPITAL PRESERVATION" as his investment objective,

which is defined on the form to mean an "[e]mphasis on preserving existing level of assets with a preference for holding cash and/or cash equivalents." Casto testified that an investment objective of capital preservation is "about as conservative as you can get." With respect to "Risk Tolerance," John initialed the line next to "Moderately conservative," and for "Time Horizon," he initialed next to "4-7 years." Casto testified that the Jackson annuity he recommended at that time met these objectives and would be a suitable investment.

According to Casto, the Yateses indicated on two occasions in 2012 that they were unhappy with the financial performance of the Jackson annuities. Casto explained to them that they had selected "a fixed option within a variable annuity." He testified that there were "a lot of different options" the Yateses could have chosen and that if they had "elected to get out of fixed and to take one of the more exposed options" available, they would have been able "to go immediately back into fixed at some point if the market suffered a shock." Casto suggested that they reallocate the annuity since the Yateses were "in it for several more years." The Yateses declined to make any changes in 2012. Denise agreed that Casto recommended certain changes in 2012 (although she claimed he recommended other products) and that the Yateses declined to make any changes to their investments, testifying that they "felt like it was just too soon after we had done something."

By the time Casto met with the Yateses in the spring of 2013, he had formed his registered investment advisor firm and had "shelved" his securities licenses. According to Casto, he informed the Yateses that he could no longer service the Jackson annuities, and he explained three options to them. Casto first told the Yateses that if they wanted to keep the Jackson policies, they needed to find a new investment advisor. Denise admitted that Casto met with the Yateses and explained that he could no longer service the Jackson annuities and advised Appellants that they could move to another advisor if they wished. Next, Casto informed the Yateses that if they did not want to change advisors, the money could be moved into a managed account, similar to the Trust Company accounts they had previously held, or the money could be transferred to an annuity similar to the AVIVA annuity they still held. The Yateses decided to stay with Casto at that point, and in April 2013, they purchased three Security Benefit annuities recommended by Casto with the funds rolled over from the Jackson products. In connection with purchasing the Security Benefit annuities, the Yateses both confirmed their risk tolerance was conservative.

When asked again by his attorney whether he was "concerned about the markets in April of 2013," John replied, "Not specifically." Denise also denied at trial that she was worried about the market. However, forms completed in connection with the purchase of the Security Benefit Life products contain various handwritten notations in spaces on the forms for comments or explanations, indicating that the Yateses were "worried about the market."

In their brief on appeal, the Yateses note evidence from exhibit 15, a BrokerCheck Report about Casto, showing that Casto had been discharged by two prior broker-dealers, one in 2012, and another in 2008 for "FAILURE TO FOLLOW COMPANY PROCEDURES FOR PAPERWORK AND SUBSEQUENTLY DOCTORED DOCUMENTS TO COVER THIS UP." Casto explained that the discharge in 2012 occurred after he informed that broker-dealer that he was setting up his registered investment advisor firm and the broker-dealer "terminated [him] for it." He explained that the discharge in 2008 occurred when he was attempting to clarify a change in the company's rule on index annuities. According to Casto, the owner of the company "thought that [Casto] added and doctored [an email] and fired [him] for it."

The Yateses refer to the evidence of these employment discharges in their brief on appeal to support their assertion that "Casto attempted to alter documents to support his recommendation to change from [Jackson National Life] annuities to [Security Benefit Life] annuities." Brief for appellants at 11. The Yateses signed the various forms for the Security Benefit purchases containing the handwritten notations, and their testimony does not clearly show any specific document alterations. Denise admitted that Casto's handwriting on another page of the application form signed that same day was present when she signed the document. John was asked about a particular handwritten notation and did not recall whether it was written there when he signed the documents. On cross-examination, John was asked to cite a specific example "anywhere in any of the exhibits where there is a blank that you believe was inaccurately filled out after the fact" by Casto. John replied, "Some of the things that you have focused on, like comments, were his opinions," and he stated that Casto "would fill that in later." When questioned further if there was "a single occasion that you are alleging that [Casto] filled that in rather than . . . filling it in before you signed it," John testified "I don't recall them being filled in before we signed it." He testified further that when they signed documents, Casto would "pull out a stack of documents," hand them around the table, and instruct the Yateses where to sign and initial them. He testified, "And I don't recall ever seeing what was filled out on them." John also testified that he generally stopped reading documents provided by Casto after 2009.

At trial, the Yateses generally admitted that Casto presented them with numerous documents explaining product features, risks, penalties, and risk tolerance preferences, which they signed. Although they claimed that they did not read the documents signed, they admitted that Casto explained the documents to them. The Yateses admitted that they were shown prospectuses, but claimed they did not take them home, and they admitted that they received regular statements in the mail, but claimed they did not open them. The Yateses admitted they did not ask questions or tell Casto that they did not understand their investments.

According to John, three financial advisor friends of his reviewed his portfolio in 2014 and advised him of problems. The Yateses ended their relationship with Casto in the fall of 2014. Prior to doing so, they never told Casto they believed there was a problem with their investments, discussed their concerns with him, or gave him an opportunity to address their concerns. Similarly, Casto testified that after the Yateses purchased the Security Benefit annuities, they never complained to him that they were unhappy with those products or how they were performing.

The record shows that the total principal amount the Yateses invested with Casto over the course of their relationship was $526,060. The total value of their investments at the time that they terminated their relationship with Casto was $594,063.23, a gain of approximately $68,000. The record also shows that $222,314 of the original $526,060 investment was used to purchase the two AVIVA annuities that the Yateses still owned at the time of trial.

In addition to the testimony noted above from the Yateses' expert as to the appropriateness of the asset allocation in the products initially purchased by the Yateses, their expert testified that an asset allocation of 60 percent equities and 40 percent bonds would have grown to $1,035,896 from July 2009 to December 31, 2014.

At the close of trial, the district court made specific findings from the bench. The court outlined the history of the Yateses' investments with Casto, and stated further:

[T]he total principal amount that [the Yateses] invested with . . . Casto over the course of their relationship was $526,060. The total value of [the Yateses'] investments at the time that the relationship was terminated with . . . Casto was $594,063.23, which is a gain of approximately $68,000.

The Court had the opportunity to observe and listen to the testimony of . . . Casto. The Court finds that . . . Casto's testimony is credible and, in fact, corroborated by the exhibits that were received into evidence. It is clear to this Court that both [of the Yateses] were given informed consent of all decisions that were made by [them].

The Court gave very little weight to the testimony of the expert . . . .

The Court finds that a judgment should be entered for . . . Casto and against [the Yateses], and that [the Yateses] first amended complaint is hereby dismissed with prejudice.

The court subsequently entered a written order memorializing its ruling in favor of Casto and against the Yateses.

The Yateses filed a timely motion to alter or amend judgment or, in the alternative, for new trial, which was denied by the district court. The court again ruled from the bench at the close of the hearing on the Yateses' motion, finding as follows:

A couple of things. In a bench trial of a law action, the Court as the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony.

The district court in this case made a specific finding that the testimony of . . . Casto was credible and, quite frankly, the Court believed . . . Casto over [the Yateses] in this case. And that is clear, constant, and unequivocal with the evidence and the corroborated evidence that was submitted over, I believe, three days that we tried this case in this courtroom.

With regard to the negligence and breach of fiduciary duty counts, the [Yateses] failed to meet their burden by the greater weight of the evidence in proving each and every one of those counts. It's clear from the evidence that . . . Casto did what his customers told him to do. The customers started with a certain asset allocation and then they changed it, and they changed it to a conservative asset allocation, a very conservative asset allocation, and he did what they asked him to do. And it was documented by the voluminous amount of evidence that the Court received into evidence, and it was documented by the signatures and initials of both [of the Yateses].

Interestingly enough, as a defense, [the Yateses] raised the fact that . . . [they] didn't read all of the documents that [they] signed. The case law is clear . . . in that situation. One who does not read a contract before signing it cannot relieve himself of his burdens. . . . There is an exception if there's an inducement of fraud, but the Court found absolutely no evidence whatsoever in this case that there was any fraud induced by . . . Casto.

To the contrary . . . Casto did what he was supposed to do, and he went above and beyond. He explained all of the documents that the [Yateses] were signing, and upon his explanation, the [Yateses] signed and initialed in . . . numerous areas.

The court again noted that the Yateses' invested funds gained approximately $68,000, a rate of return of approximately 12 percent, and it found that all changes to the Yateses' portfolio were made with their verbal and written consent. The court again discounted the testimony of the Yateses' expert, stating it gave his testimony very little weight in part because he relied on what the Yateses told him over three to four meetings and several telephone conversations. The court stated, "And having given very little weight and very little credibility to the [Yateses], the Court had to give very little weight to the testimony of [the expert witness]." The court denied the Yateses' motion in its entirety, and it subsequently entered an order memorializing its ruling. The Yateses subsequently perfected their appeal to this court.

## ASSIGNMENTS OF ERROR

The Yateses assert, consolidated and restated, that the district court erred in (1) finding that Casto did not breach a fiduciary duty to them and (2) finding that Casto was not negligent.

## STANDARD OF REVIEW

In their briefs on appeal, the parties set forth differing standards of review. The Yateses assert that this is an equity action because both of their theories of recovery stem from a breach of trust by a fiduciary which caused harm to them in that they trusted and relied upon Casto's superior knowledge. On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court, provided that where credible evidence is in conflict in a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Wisner v. Vandelay Investments*, 300 Neb. 825, 916 N.W.2d 698 (2018). A fiduciary duty arises out of a confidential relationship which exists when one party gains the confidence of the other and purports to act or advise with the other's interest in mind. *Gonzalez v. Union Pacific RR. Co.*, 282 Neb. 47, 803 N.W.2d 424 (2011). In a confidential or fiduciary relationship in which confidence is rightfully reposed on one side and a resulting superiority and opportunity for influence are thereby created on the other, equity will scrutinize the transaction critically, especially where age, infirmity, and instability are involved, to see that no injustice has occurred. *Id.* Superiority of bargaining power alone does not create a fiduciary duty, because there must also be an opportunity to exercise undue influence. *Id.* The mere existence of a broker-client relationship, without more, does not imply a confidential relationship. *DeSciose v. Chiles, Heider & Co.*, 239 Neb. 195, 476 N.W.2d 200 (1991).

In his brief, Casto asserts that this is an action at law. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Bloedorn Lumber Co. v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018). In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Pan v. IOC Realty Specialist*, 301 Neb. 256, 918 N.W.2d 273 (2018). An appellate court independently reviews questions of law decided by a lower court. *Mays v. Midnite Dreams*, 300 Neb. 485, 915 N.W.2d 71 (2018).

Although in many contexts the traditional distinctions between law and equity have been abolished, whether an action is one in equity or one at law controls in determining an appellate court's scope of review. *Christiansen v. County of Douglas*, 288 Neb. 564, 849 N.W.2d 493 (2014). Whether a particular action is one at law or in equity is determined by the essential character of a cause of action and the remedy or relief it seeks. *Id.* Where none of the extraordinary powers of a court of equity are required in order to give either party the relief sought, and a court of law can afford complete relief, the action is one at law. *Collection Bureau of Grand Island v. Fry*, 9 Neb. App. 277, 610 N.W.2d 442 (2000). Where a plaintiff seeks only a judgment for money, the case is clearly one at law. *Id.* Negligence actions are actions at law. See *Jacobson v. Shresta*, 288 Neb. 615, 849 N.W.2d 515 (2014).

In this case, the district court treated this as an action at law. In their operative complaint, the Yateses alleged damages of excessive fees and commissions and lost dollars in financial performance by their portfolio. They sought only compensatory monetary relief. Accordingly, as did the district court, we have treated this case as an action at law.

## ANALYSIS

In their operative complaint, the Yateses set forth theories of recovery premised on negligence and breach of fiduciary duty. In order to recover in a negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages. *Cruz v. Lopez*, 301 Neb. 531, 919 N.W.2d 479 (2018). The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.* It is for the fact finder in a negligence case to determine, on the facts of each individual case, whether or not the evidence establishes a breach of that duty. *Latzel v. Bartek*, 288 Neb. 1, 846 N.W.2d 153 (2014). The breach of a fiduciary duty has been likened to professional malpractice; therefore, to prove the elements of breach of fiduciary duty, the moving party must establish the elements of negligence--duty, breach of duty, causation, and damages. *Qualsett v. Abrahams*, 23 Neb. App. 958, 879 N.W.2d 392 (2016). See *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018) (existence of fiduciary duty and scope of that duty are questions of law for court to decide). In this case, the district court found "[w]ith regard to the negligence and breach of fiduciary duty theories of recovery, the [Yateses] failed to meet their burden by the greater weight of the evidence proving each and every one of those counts."

On appeal, the Yateses argue that Casto breached duties owed to them in various regards. First, the Yateses assert that Casto "breached his common law and statutory fiduciary duty and responsibilities to them by negligently managing their assets." Brief for appellants at 18. They also assert that Casto breached his duty to them when he "disregarded nearly all of the equity market." Brief for appellants at 24. They argue, "There is little doubt that . . . Casto breached his fiduciary duty and was, at a minimum, negligent in managing" the Yateses retirement portfolio. Brief for appellants at 26. They argue generally that Casto sold them inappropriate investment products, enriching himself in the process, and failed to properly advise as to appropriate investment options. However, at the conclusion of trial, the district court found that the Yateses "were given informed consent of all decisions that were made by [them]." In ruling on the motion for new trial, the court specifically found that Casto "did what he was supposed to do, and he went above and beyond. He explained all the documents that [Yateses] were signing, and upon his explanation, [Yateses]

- 8 -

signed and initialed in numerous areas." The court observed that the Yateses made changes to their initial asset allocation, which changes were documented in the record by "the voluminous amounts of evidence" received by the court, including the Yateses signatures and initials.

The district court also noted the "defense" raised by the Yateses that they did not read all of the documents that they signed. We note, as did the lower court, in the absence of fraud, one who signs an instrument without reading it, when one can read and has had the opportunity to do so, cannot avoid the effect of one's signature merely because one was not informed of the contents of the instrument. *Cullinane v. Beverly Enters. - Neb.*, 300 Neb. 210, 912 N.W.2d 774 (2018). Here, the court found "absolutely no evidence whatsoever that there was any fraud induced by . . . Casto," and the Yateses do not argue otherwise on appeal. The evidence does not establish that Casto breached any duty to properly advise and inform the Yateses of investment options.

The Yateses raise arguments about the changes in Casto's securities licensing. They argue that Casto "lost" his securities license in 2012 and could no longer manage all of the Yateses' assets, and that as a result, he "intentionally destroyed a proper asset allocation in order to enrich himself." Brief for appellants at 26. The Yateses' characterization of what happened with Casto's licenses is contradicted by the evidence. The record shows that he "shelved" a particular securities license when he formed his registered investment advisor firm, which requires different licensing. The record shows that Casto informed the Yateses that he was no longer able to service the Jackson National annuities, a fact admitted to by Denise at trial. The record shows that Casto advised the Yateses of various options available to them, including switching advisors, and that the Yateses chose to stay with Casto at that point. There is nothing in the record to show that Casto did not have the correct licensing to sell any of the products sold to the Yateses. The evidence does not establish a breach of any duty with respect to the status of Casto's securities license.

Next, the Yateses claim that Casto breached his duty to them by failing to disclose commissions. This claim is contradicted by the evidence. Casto testified that he disclosed the one percent management fee he charged the Yateses on the Trust Company securities accounts at the beginning of the relationship. Although Casto did not disclose to the Yateses the amount of the commission he earned for purchasing the annuities, he testified that he told them he was paid a commission on the annuities by the issuing insurance company. Casto testified that payment by the company was "[v]ery typical" and that no part of the commission on the annuities was ever paid out of the Yateses' principal. The evidence failed to establish that Casto breached any duty with respect to commissions.

Finally, the Yateses argue that Casto engaged in "excessive trading of annuities" in violation of the Nebraska Protection in Annuity Transactions Act. Brief for appellants at 24. See Neb. Rev. Stat. § 44-8101 et seq. (Cum. Supp. 2016). The Yateses do not explain in their brief exactly how or which section of the Act they believe was violated by the exchange of the Jackson National annuities for the Security Benefit annuities. We note Neb. Rev. Stat. § 44-8106 (Cum. Supp. 2016) which concerns the recommendation, purchase, exchange, or replacement of annuities. It provides, in part:

> (1) The insurance producer, or insurer if an insurance producer is not involved, shall have reasonable grounds to believe that the recommendation is suitable for the consumer based on the facts disclosed by the consumer before making a recommendation to a consumer under the Nebraska Protection in Annuity Transactions Act. The

recommendation shall be based on the facts disclosed by the consumer relating to his or her investments, other insurance products, and the financial situation and needs of the consumer. This information shall include the consumer's suitability information, and, if there is a reasonable basis to believe the information, all of the following:

(a) That the consumer has been reasonably informed of various features of the annuity, such as the potential surrender period and surrender charge, potential tax penalty if the consumer sells, exchanges, surrenders, or annuitizes the annuity, mortality and expense fees, investment advisory fees, potential charges for and features of riders, limitations on interest returns, insurance and investment components, and market risk;

(b) That the consumer would benefit from certain features of the annuity, such as tax-deferred growth, annuitization, or death or living benefit;

(c) That the particular annuity as a whole, the underlying subaccounts to which funds are allocated at the time of purchase or exchange of the annuity, and riders and similar product enhancements, if any, are suitable, and in the case of an exchange or replacement, the transaction as a whole is suitable for the particular consumer based on his or her suitability information; and

(d) In the case of an exchange or replacement of an annuity, the exchange or replacement is suitable, including the consideration as to whether:

(i) The consumer will incur a surrender charge, be subject to the commencement of a new surrender period, lose existing benefits, such as death, living, or other contractual benefits, or be subject to increased fees, investment advisory fees, or charges for riders and similar product enhancements;

(ii) The consumer would benefit from product enhancements and improvements; and

(iii) The consumer has had another annuity exchange or replacement and, in particular, an exchange or replacement within the preceding thirty-six months.

(2) Before the execution of a purchase, exchange, or replacement of an annuity resulting from a recommendation, an insurance producer, or an insurer if an insurance producer is not involved, shall make reasonable efforts to obtain the consumer's suitability information.

(3) Except as expressly permitted under subsection (4) of this section, an insurer shall not issue an annuity recommended to a consumer unless there is a reasonable basis to believe the annuity is suitable based on the consumer's suitability information.

. . . .

See, also, Neb. Rev. Stat. § 44-8105(7) (Cum. Supp. 2016) (defining "[s]uitability information").

The Yateses argue that the transaction involving the sale of the Jackson National annuity and purchase of Security Benefit annuity was within 3 years, which they argue was in violation of § 44-8101. Section 44-8101 only states how the Act is to be cited and contains no such prohibition. The Yateses do not reference other specific provisions of the Act beyond those noted above; nor do they point to any evidence establishing any violation of the above provisions, which do not place any limit on the purchase or sale of annuities, but require annuity issuers and producers to take certain factors into consideration when deciding whether an annuity purchase is suitable. The

record does not show that Casto failed to take such factors into consideration, and the Yateses have not shown a breach of any duty in that regard.

The district court made several specific determinations about the credibility of the witnesses in this case. At trial, the court found that Casto's testimony was credible and corroborated by the exhibits that were received into evidence. In overruling the Yateses' motion for new trial, the court stated again that it had found Casto's testimony was credible and that it believed Casto's testimony over that of the Yateses. In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *In re Estate of Etmund*, 297 Neb. 455, 900 N.W.2d 536 (2017). An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *Id.* The district court also discounted the testimony of the Yateses' expert. Triers of fact are not required to take opinions of experts as binding upon them, and determining the weight to be given expert testimony is uniquely the province of the fact finder. *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018).

In reviewing the judgment, we have not reweighed the evidence, but have considered the evidence in the light most favorable to Casto, the successful party, and have resolved evidentiary conflicts in his favor, giving him every reasonable inference deducible from the evidence. See *Pan v. IOC Realty Specialist*, 301 Neb. 256, 918 N.W.2d 273 (2018). The district court's factual findings are not clearly wrong. Accordingly, we affirm.

CONCLUSION

For the reasons set forth above, we affirm.

AFFIRMED.