Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/23/2020 09:14 AM CDT

Shelter Insurance Company, appellee and
cross-appellee, v. Santos Gomez, Jr., et al.,
appellees and cross-appellants, Carlene S.
Calder, Personal Representative of the
Estate of Jason Kraeger, deceased,
appellant, and Kate Benjamin,
appellee and cross-appellee.

___ N.W.2d ___

Filed July 31, 2020.    No. S-18-927.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm
a lower court's grant of summary judgment if the pleadings and admit-
ted evidence show that there is no genuine issue as to any material facts
or as to the ultimate inferences that may be drawn from those facts and
that the moving party is entitled to judgment as a matter of law.
2. ____: ____. In reviewing a summary judgment, an appellate court views
the evidence in the light most favorable to the party against whom the
judgment was granted and gives that party the benefit of all reasonable
inferences deducible from the evidence.
3. **Statutes: Appeal and Error.** Statutory interpretation presents a ques-
tion of law for which an appellate court has an obligation to reach an
independent conclusion irrespective of the decision made by the court
below.
4. **Motor Carriers.** Neb. Rev. Stat. § 75-363 (Cum. Supp. 2014) adopts,
as Nebraska law, several parts of the Federal Motor Carrier Safety
Regulations and makes them applicable to certain intrastate motor carri-
ers not otherwise subject to federal regulation.
5. **Statutes: Appeal and Error.** Statutory language is to be given its plain
and ordinary meaning, and an appellate court will not resort to inter-
pretation to ascertain the meaning of statutory words which are plain,
direct, and unambiguous.

6. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

7. **Statutes.** It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

8. **Motor Carriers: Insurance.** Under the plain language of Neb. Rev. Stat. § 75-363 (Cum. Supp. 2014) and part 387 of title 49 of the Code of Federal Regulations adopted therein, compliance with the minimum financial responsibility requirements is the responsibility of the motor carrier, not the insurer.

9. ____: ____. Neither Neb. Rev. Stat. § 75-363 (Cum. Supp. 2014) nor part 387 of title 49 of the Code of Federal Regulations adopted therein require an insurer to issue a policy with liability limits that satisfy a motor carrier's minimum level of financial responsibility.

Appeal from the District Court for Box Butte County: DEREK C. WEIMER, Judge. Affirmed.

Maren Lynn Chaloupka, of Chaloupka, Holyoke, Snyder, Chaloupka & Longoria, P.C., L.L.O., for appellant.

Raymond E. Walden and Michael T. Gibbons, of Woodke & Gibbons, P.C., L.L.O., for appellee Shelter Insurance Company.

Amy L. Patras, of Crites, Shaffer, Connealy, Watson, Patras & Watson, P.C., L.L.O., for appellees Santos Gomez, Jr., et al.

Steven W. Olsen and Paul W. Snyder, of Simmons Olsen Law Firm, P.C., for appellee Kate Benjamin.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

STACY, J.

Through the enactment of Neb. Rev. Stat. § 75-363 (Cum. Supp. 2014), the Nebraska Legislature adopted several parts of the Federal Motor Carrier Safety Regulations and made those regulations applicable to certain intrastate motor carriers not

otherwise subject to the federal regulations.[1] One of the federal regulations adopted by statute sets out minimum levels of financial responsibility for motor carriers.[2] The central question in this appeal is whether that federal regulation imposes a duty on insurers to issue policies that satisfy a motor carrier's minimum level of financial responsibility. Because we conclude that compliance with the financial responsibility requirements under § 75-363 and the pertinent federal regulations is the duty of the motor carrier and not its insurer, we affirm the judgment of the district court.

## I. UNDISPUTED FACTS

### 1. Collision

On May 27, 2015, Jason Kraeger was riding his bicycle on a highway in Morrill County, Nebraska, when he was struck by a 1988 Peterbilt semi-tractor being driven by Santos Gomez, Jr. (Gomez Jr.). The negligence of Gomez Jr. is not in dispute. Kraeger died from injuries sustained in the collision.

The Peterbilt involved in the collision was owned by the driver's parents, Santos Gomez, Sr., and Julia Gomez, who operate Santos Gomez Trucking, an unincorporated commercial trucking business operating exclusively within Nebraska (collectively Gomez Trucking).

### 2. Shelter's Policy

At the time of the collision, Gomez Trucking insured the Peterbilt under a commercial automobile liability policy with Shelter Insurance Company (Shelter). When applying for insurance with Shelter, Gomez Trucking represented that it had no federal motor carrier number and that its trucks made no deliveries outside Nebraska. It requested a bodily injury liability limit of $1 million. Gomez Trucking used local Shelter agent Kate Benjamin to procure the Shelter policy

---

[1] See *Cruz v. Lopez*, 301 Neb. 531, 919 N.W.2d 479 (2018).

[2] See § 75-363(3)(d) (adopting "Part 387" of title 49 of the Code of Federal Regulations).

and to request periodic adjustments to the liability limits of such policy.

Gomez Trucking had a business practice of adjusting the liability limits on the Shelter policy either up or down, depending on how its trucks were to be used. The apparent goal of this practice was to minimize the premium cost over time by reducing the liability limit when a truck was not in use. The evidence shows that after initially purchasing liability limits of $1 million, Gomez Trucking requested, and Benjamin made, the following adjustments to the liability limits on the Shelter policy:

• On November 24, 2014, the liability limit was reduced from $1 million to $100,000;
• On December 4, 2014, the liability limit was increased to $1 million;
• On March 15, 2015, the policy was renewed and the liability limit was reduced to $500,000;
• On March 19, 2015, the liability limit was reduced again to $100,000;
• On April 15, 2015, the liability limit was increased to $1 million;
• On April 20, 2015, the liability limit was reduced to $100,000.

On the day of the fatal collision, May 27, 2015, Julia visited Benjamin's office twice, both times seeking to adjust the liability limits. The first time, Julia asked to increase the liability limit from $100,000 to $500,000, explaining that Gomez Jr. was going to be using the Peterbilt. Benjamin entered data on the requested policy limit change into the computer system, and Julia left Benjamin's office. About 15 minutes after Julia left Benjamin's office, she returned, noticeably upset. She told Benjamin that Gomez Jr. had collided with a bicyclist while driving the Peterbilt, and she asked whether the liability limit could be increased again. Benjamin told Julia she could do so, but the higher limit would not "backdate" to an accident that already had occurred. The precise time of the collision is not apparent from our record, but the appellant's

brief states the collision occurred just before Julia's first visit to Benjamin's office.

As discussed in the next section, under § 75-363(3)(d) and the federal regulation adopted therein, intrastate motor carriers are required to obtain and have in effect certain minimum levels of financial responsibility. Because those regulatory requirements are central to the dispute which gave rise to this declaratory judgment action, we set them out now and discuss them in more detail later in our analysis.

### 3. § 75-363

At the time of the collision, § 75-363 provided, in pertinent part:

（1) The parts, subparts, and sections of Title 49 of the Code of Federal Regulations listed below, as modified in this section . . . in existence and effective as of January 1, 2014, are adopted as Nebraska law.

（2) Except as otherwise provided in this section, the regulations shall be applicable to:

（a) All motor carriers, drivers, and vehicles to which the federal regulations apply; and

（b) All motor carriers transporting persons or property in intrastate commerce[.]

Subsection (3) of § 75-363 contained a list of the federal regulations adopted as Nebraska law, and it included 49 C.F.R. § 387 (2014) (Part 387), which sets out the financial responsibility requirements for motor carriers.[3]

Part 387 is titled "Minimum Levels of Financial Responsibility for Motor Carriers," and it is composed of several subparts. Only subpart A, which applies to for-hire motor carriers transporting property,[4] is pertinent to this case. The purpose of that subpart is to prescribe

the minimum levels of financial responsibility required to be maintained by motor carriers of property [and] to

---

[3] § 75-363(1) and (2) (Cum. Supp. 2014).

[4] 49 C.F.R. § 387.3(a).

create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways.[5]

Under this federal regulation, "No motor carrier shall operate a motor vehicle until the motor carrier has obtained and has in effect the minimum levels of financial responsibility as set forth in § 387.9 of this subpart."[6] That section identifies different minimum levels of financial responsibility depending on the nature of the property being transported; the type of vehicle being used; and whether it is being operated in interstate, foreign, or intrastate commerce.[7] The lowest level of financial responsibility is $750,000, and it applies to for-hire vehicles operated in interstate or foreign commerce with a gross vehicle weight rating of 10,001 pounds or more transporting nonhazardous property.[8] Higher levels of financial responsibility are required for vehicles transporting certain hazardous materials in interstate, intrastate, and foreign commerce.[9]

As such, in Nebraska, § 75-363(2) makes the federal regulations just described applicable not only to the motor carriers, drivers, and vehicles to which the federal regulations already apply,[10] but also to "[a]ll motor carriers transporting persons or property in intrastate commerce,"[11] with certain exceptions.[12] The record suggests that before the fatal collision,

---

[5] 49 C.F.R. § 387.1.

[6] 49 C.F.R. § 387.7(a).

[7] See 49 C.F.R. § 387.9(1) through (4).

[8] 49 C.F.R. § 387.9(1).

[9] See 49 C.F.R. § 387.9(2) through (4).

[10] § 75-363(2)(a).

[11] § 75-363(2)(b).

[12] See, e.g., § 75-363(5) (excluding certain farm trucks operated only in intrastate commerce).

the parties were generally unaware of the minimum financial responsibility requirements imposed by § 75-363(3)(d) and Part 387. [13]

## 4. Wrongful Death Action

In 2015, the duly appointed personal representative for Kraeger's estate filed a wrongful death and survival action against "Gomez Jr. and Santos Gomez, Sr., d/b/a Santos Gomez Trucking." Shelter offered to settle the suit on behalf of the defendants for $100,000—the liability limit Shelter asserted was in effect at the time of the collision. The personal representative rejected Shelter's offer, but eventually reached a settlement directly with the defendants. Under that settlement, the defendants confessed judgment in the amount of $750,000 and assigned to the personal representative any claim they may have against Shelter and/or Benjamin under the policy issued to Gomez Trucking.

## 5. Declaratory Judgment Action

In 2016, Shelter filed a declaratory judgment action in the district court for Box Butte County. It sought a declaration of the applicable liability limit under the policy issued to Gomez Trucking for damages arising from the fatal bicycle collision of May 27, 2015. Named as defendants and interested parties in the declaratory judgment action were Benjamin, Gomez Trucking, Gomez Jr., and the personal representative of Kraeger's estate.

As relevant to the issues on appeal, Shelter's operative amended complaint alleged that on the date of the fatal collision, Shelter insured Gomez Trucking under a commercial automobile liability policy with liability limits of $100,000,

---

[13] But see Neb. Rev. Stat. § 75-369 (Reissue 2018) (requiring Department of Motor Vehicles and county treasurers to distribute declaration regarding federal regulations to each applicant who registers commercial motor vehicle subject to § 75-363; applicants required to acknowledge they have read declaration and are aware Federal Motor Carrier Safety Regulations have been enacted into state law).

and further alleged that the Peterbilt was a covered vehicle on that policy. Shelter also alleged that the personal representative for Kraeger's estate had demanded damages in excess of Shelter's $100,000 policy limits and was asserting Shelter was "obligated to afford coverage in excess of that stated in the policy due to certain federal regulations."

Benjamin answered the amended complaint and generally joined in Shelter's request for a declaratory judgment. Summarized, Benjamin's answer alleged the Shelter policy was originally issued with liability limits of $1 million and that all subsequent adjustments to the liability limits were made at the insured's request.

The personal representative answered Shelter's amended complaint both in her capacity as the personal representative of Kraeger's estate and as the assignee of Gomez Trucking and Gomez Jr. The personal representative's answer generally denied Shelter's allegation that the liability limits in place at the time of the collision were $100,000, and she asserted that under § 75-363 and the federal regulations adopted therein, Benjamin was required to sell, and Shelter was required to issue, a policy with liability limits of at least $750,000. However, no request was made to reform the policy. Instead, the personal representative took the position that the parties' real dispute was not based in contract at all, but in professional negligence.

In that regard, the personal representative filed a counterclaim against Shelter and a cross-claim against Benjamin, seeking to recover $750,000 in damages for negligence and demanding a jury trial. The cross-claim alleged Benjamin was negligent in failing to advise Gomez Trucking that § 75-363 required intrastate motor carriers to have a minimum of $750,000 in liability coverage. The counterclaim alleged Benjamin's negligence should be imputed to Shelter under an agency theory. Shelter and Benjamin denied any negligence and raised several affirmative defenses, including that Gomez Trucking was contributorily negligent in failing to obtain the minimum levels of financial responsibility required by § 75-363.

## 6. Summary Judgment

All parties moved for summary judgment. In an order entered September 20, 2018, the district court disposed of all issues in the case by granting the summary judgment motions filed by Shelter and Benjamin, and overruling those filed by all other parties. The parties' arguments, and the court's reasoning, are summarized below.

### (a) Declaratory Judgment

In seeking and opposing summary judgment on the declaratory judgment, the parties did not dispute that the Shelter policy issued to Gomez Trucking had a liability limit of $100,000 at the time of the fatal collision. But they did dispute whether such a limit was enforceable, given the provisions of § 75-363(3)(d).

The personal representative argued the $100,000 liability limit was void and unenforceable as a matter of law because it failed to comply with the minimum financial responsibility requirements imposed by § 76-363 and Part 387. Shelter and Benjamin argued these provisions had no impact on the enforceability of the $100,000 liability limit, because § 75-363 and Part 387 make it the responsibility of the motor carrier, not the insurer, to obtain and have in effect the required minimum levels of financial responsibility.

After analyzing the provisions of § 75-363 and Part 387, the district court agreed with Shelter and Benjamin, reasoning:

> [T]here is no reference to be found within the operative statute and regulations that specifically create a duty on the part of an insurer to ascertain or confirm the existence of sufficient insurance policies, sureties or resources to satisfy the minimum required amount of insurance under [49 C.F.R.] § 387.9. All of the relevant provisions relate to requirements of or for the "motor carrier". The motor carrier is to obtain and have in effect the minimum levels of financial responsibility. The motor carrier is not to operate a motor vehicle until it has so done. *Neb. Rev.*

*Stat.* § 75-363 puts the onus on the motor carrier to comply with the applicable C.F.R. provisions.

The district court also found it significant that under the federal regulations, "financial responsibility" was not limited to insurance policies, but included surety bonds and approved self-insurance.[14]

The district court ultimately concluded there were no genuine issues of material fact related to Shelter's amended complaint for declaratory judgment. It found that § 75-363 imposed no duty on Shelter or Benjamin to "only sell or market an insurance policy [to Gomez Trucking for] $750,000 or more," and it ultimately concluded, as a matter of law, that the $100,000 liability limit in place at the time of the accident was enforceable.

### (b) Cross-Claim and Counterclaim

Regarding the cross-claim and counterclaim for professional negligence, the district court also found Shelter and Benjamin were entitled to judgment as a matter of law. Relying on *Hansmeier v. Hansmeier*,[15] the court found Benjamin had no legal duty to advise Gomez Trucking about the financial responsibility requirements of § 75-363 and no duty to sell Gomez Trucking a liability policy that satisfied the motor carrier's minimum level of financial responsibility under that statute.[16]

The personal representative timely appealed from the summary judgment order, and Gomez Trucking and Gomez Jr. cross-appealed. We moved the case to our docket on our own motion.

---

[14] See, e.g., 49 C.F.R. §§ 387.5 and 387.7(b) and (d).

[15] *Hansmeier v. Hansmeier*, 25 Neb. App. 742, 752, 912 N.W.2d 268, 275-76 (2018) (holding "an insurance agent has no duty to anticipate what coverage an insured should have. . . . Rather, when an insured asks an insurance agent to procure insurance, the insured has a duty to advise the insurance agent as to the desired insurance").

[16] See, also, *Dahlke v. John F. Zimmer Ins. Agency*, 245 Neb. 800, 515 N.W.2d 767 (1994).

## II. ASSIGNMENTS OF ERROR

The personal representative assigns a single error: The district court erred in granting declaratory judgment in favor of Shelter and Benjamin and declaring the liability limit of the Shelter policy was $100,000 "irrespective of the statutorily-required minimum" under § 75-673. Similarly, the cross-appeal of Gomez Trucking and Gomez Jr. assigns it was error to grant summary judgment in favor of Shelter because its policy did not provide "lawful coverage."

## III. STANDARD OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[17]

[2] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[18]

[3] Statutory interpretation presents a question of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[19]

## IV. ANALYSIS

As a threshold matter, we note that neither the appellant nor the cross-appellants assigned error to the trial court's judgment in favor of Benjamin and Shelter on the professional

---

[17] *JB & Assocs. v. Nebraska Cancer Coalition*, 303 Neb. 855, 932 N.W.2d 71 (2019).

[18] *Id.*

[19] *Id.*; *Cruz, supra* note 1.

negligence cross-claim and counterclaim. Instead, their assignments of error focus exclusively on the district court's declaratory judgment ruling which interpreted § 75-363(3)(d) and the federal regulations incorporated therein. We limit our analysis accordingly.[20]

## 1. Minimum Levels of Financial Responsibility Under § 75-363 and Part 387

[4] As stated earlier, § 75-363 adopts, as Nebraska law, several parts of the Federal Motor Carrier Safety Regulations and makes them applicable to certain intrastate motor carriers not otherwise subject to federal regulation.[21] Since 2006, one of the federal regulations included in § 75-363 has been Part 387,[22] which governs minimum levels of financial responsibility for motor carriers. This case presents our first opportunity to consider the financial responsibility requirements imposed by § 75-363 and Part 387, and the parties urge significantly different interpretations.

The appellant and the cross-appellants argue that § 75-363 and Part 387 require insurers, when issuing policies to intrastate motor carriers, to provide liability limits that will satisfy the motor carrier's minimum financial responsibility under 49 C.F.R. § 387.9. They contend that the Peterbilt was required to have a minimum level of financial responsibility of $750,000 and argue that any policy providing lower limits was "illegal"[23] and unenforceable.

---

[20] *State v. Ferrin*, 305 Neb. 762, 770-71, 942 N.W.2d 404, 411-12 (2020) ("[t]o be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error").

[21] See *Cruz, supra* note 1.

[22] See 2006 Neb. Laws, L.B. 1007, § 13, codified as § 75-363(3)(d) (adopting 49 C.F.R. § 387).

[23] See, brief for appellant at 16, 18, 19, and 21; brief for appellees Gomez Trucking and Gomez Jr. on cross-appeal at 41.

Shelter and Benjamin generally argue that § 75-363 and Part 387 put the burden on the motor carrier to obtain and maintain the required minimum levels of financial responsibility and do not require an insurer to issue a policy with liability limits that satisfy the motor carrier's financial responsibility. They contend that by enacting § 75-363 and Part 387, the Legislature sought to regulate motor carriers, not insurers, and they point out that Part 387 permits motor carriers to meet their minimum level of financial responsibility through more than one policy of insurance, and using methods other than insurance.[24]

[5-7] In considering the competing interpretations advanced by the parties, we are guided by settled principles. Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[25] Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[26] It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.[27] We apply these rules of statutory construction both to § 75-383 and to Part 387, because that federal regulation has been adopted as Nebraska law.

Before beginning our analysis, we pause to note that our appellate record does not include evidence of the gross weight rating of the Peterbilt or the nature of the load, if any, being transported at the time of the accident. Consequently, while the parties appear to generally agree the Peterbilt was the type of

---

[24] See 49 C.F.R. §§ 387.5 and 387.7(b) and (d).

[25] *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019).

[26] *Id.*

[27] *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019).

vehicle described in 49 C.F.R. § 387.9(1) and thus was subject to minimum financial responsibility of $750,000, we express no opinion in that regard. Instead, as we explain further below, we conclude that even if the Peterbilt was the type of vehicle described in 49 C.F.R. § 387.9(1), the district court was correct to conclude that Part 387 imposes the minimum financial responsibility requirements only on the motor carrier, not on the insurer.

## 2. Compliance With § 75-363 and Part 387 Is Responsibility of Motor Carrier

The plain language of both § 75-363 and Part 387 focuses exclusively on regulating motor carriers. Section 75-363 makes the selected federal regulations applicable to "[*a*]*ll motor carriers* transporting . . . property in intrastate commerce" and to the vehicles and drivers of such motor carriers.[28]

Similarly, Part 387 applies only to "for-hire *motor carriers*,"[29] and the stated purpose of the regulation is to create additional incentives for "*motor carriers* to maintain and operate their vehicles in a safe manner and t*o assure that motor carriers maintain* an appropriate level of financial responsibility for motor vehicles operated on public highways."[30] The financial responsibility requirements under Part 387 are directed to the motor carrier, requiring that "[n]o motor carrier shall operate a motor vehicle *until the motor carrier has obtained* and has in effect the minimum levels of financial responsibility as set forth in [49 C.F.R. § 387.9]."[31]

[8] Given the plain language of § 75-363 and Part 387, we conclude that compliance with the minimum financial responsibility requirements is the responsibility of the motor carrier, not the insurer.

---

[28] § 75-363(2)(b) (emphasis supplied).

[29] 49 C.F.R. § 387.3(a) (emphasis supplied).

[30] 49 C.F.R. § 387.1 (emphasis supplied).

[31] 49 C.F.R. § 387.7(a) (emphasis supplied).

### 3. Motor Carriers Can Satisfy Minimum Financial Responsibility Requirements Through Combination of Resources

Importantly, Part 387, and the federal statute on which that regulation is based,[32] allows a motor carrier to meet its minimum financial responsibility through more than just a single insurance policy. The federal statute provides that a "motor carrier may obtain the required amount of financial responsibility from more than one source provided the cumulative amount is equal to the minimum requirements."[33] Further, that federal statute generally authorizes financial responsibility to be established using "one or a combination of the following," including insurance, a guarantee, a surety bond, or qualification as a self-insurer.[34] Part 387 similarly permits proof of the required level of financial responsibility to be shown through "[p]olicies of [i]nsurance," surety bonds, or authorized self-insurance.[35]

The interpretation of Part 387 proposed by the appellant and the cross-appellants does not accommodate, and would require that we read out of the federal regulation altogether, those provisions allowing motor carriers to combine more than one policy, and use more than one method, to meet the minimum financial responsibility requirement under Part 387.

### 4. Part 387 Does Not Require Insurers to Issue Policy With Liability Limits That Satisfy Motor Carrier's Minimum Level of Financial Responsibility

The appellant and the cross-appellants repeatedly characterize the $100,000 liability limit in Shelter's policy as illegal or unlawful under Part 387. The appellant relies on *Steffen v.*

---

[32] See 49 U.S.C. § 31139 (2012).

[33] 49 U.S.C. § 31139(f)(3).

[34] 49 U.S.C. § 31139(f)(2).

[35] 49 C.F.R. § 387.7(d).

*Progressive Northern Ins. Co.* [36] to argue that Shelter should not be permitted to issue a policy containing less than the statutorily required coverage and to argue that the minimum financial responsibility requirements of Part 387 should be read into the Shelter policy. We find the appellant's position in this regard contrary to the plain language of Part 387, and we find the appellant's reliance on *Steffen* to be misplaced.

It is true there are some Nebraska statutes which mandate the type and amount of coverage insurers must provide when issuing an automobile liability policy. For instance, Neb. Rev. Stat. § 44-6408 (Reissue 2010) provides, "No policy insuring against liability imposed by law for bodily injury, sickness, disease, or death suffered by a natural person arising out of the ownership, operation, maintenance, or use of a motor vehicle . . . shall be delivered, issued for delivery, or renewed" unless it provides uninsured and underinsured motorist coverage with limits of $25,000 per person and $50,000 per accident. Similarly, other statutes within the Uninsured and Underinsured Motorist Insurance Coverage Act[37] (UUMICA) mandate definitions of an uninsured motor vehicle[38] and an underinsured motor vehicle,[39] list available exclusions,[40] and address the priority of payment when multiple policies apply.[41] As such, the plain language of the UUMICA seeks to regulate the issuance of automobile insurance policies in Nebraska and places the burden of complying with certain statutory provisions directly on the insurer. For

---

[36] *Steffen v. Progressive Northern Ins. Co.*, 276 Neb. 378, 754 N.W.2d 730 (2008) (insurers may not issue policies that carry terms and conditions less favorable to insured than those provided in Uninsured and Underinsured Motorist Insurance Coverage Act).

[37] Neb. Rev. Stat. §§ 44-6401 to 44-6414 (Reissue 2010).

[38] See § 44-6405.

[39] See § 44-6406.

[40] See §§ 44-6407 and 44-6413.

[41] See § 44-6411.

the sake of completeness, we note the Shelter policy included uninsured and underinsured motorist coverage in limits higher than required by § 44-6408.

As this court made clear in *Steffen*, insurers may not issue policies that carry terms and conditions less favorable to the insured than those provided in the UUMICA.[42] When the terms of such a policy are less favorable than the UUMICA requires, the UUMICA, and not the policy, will be controlling.[43]

But neither *Steffen* nor its reasoning apply here. Unlike the compulsory provisions of the UUMICA, § 75-363 and Part 387 do not regulate the terms and conditions of insurance policies; instead, their purpose is to regulate motor carriers. The plain language of § 75-363 applies only to motor carriers as defined in that statute, and the stated purpose of Part 387 is to "assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways."[44] In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[45]

[9] The district court correctly concluded that neither § 75-363 nor Part 387 require an insurer to issue a policy with liability limits that satisfy a motor carrier's minimum level of financial responsibility.

## 5. Declaratory Judgment
## Correctly Decided

For the reasons set out above, we conclude the district court was correct in finding, as a matter of law, that Shelter was not required by the provisions of § 75-363 and Part 387 to issue Gomez Trucking a policy with liability limits of at

---

[42] *Steffen, supra* note 36.

[43] See *id.*

[44] 49 C.F.R. § 387.1.

[45] *Steffen, supra* note 36.

least $750,000 and that the $100,000 liability limit in place at the time of the fatal collision was neither inconsistent with nor repugnant to Nebraska law. Our conclusion in this regard is compelled by the plain language of § 75-363 and Part 387, both of which place the burden of compliance on the motor carrier, and our reasoning is consistent with that of other courts to have considered similar questions.[46]

## V. CONCLUSION

Finding no merit to the assigned errors, we affirm the district court's judgment.

Affirmed.

---

[46] See, e.g., *Illinois Central R. Co. v. Dupont*, 326 F.3d 665 (5th Cir. 2003) (financial responsibility under Part 387 is directed at motor carrier and does not impose duty on insurer to make sure motor carrier complies with requirements); *North Carolina Farm Bureau Mut. Ins. Co., Inc. v. Armwood*, 361 N.C. 576, 653 S.E.2d 392 (2007) (reversing decision to reform commercial automobile insurance policy to reflect minimum liability limit of $750,000, reasoning federal motor carrier regulations place duty to provide minimum level of financial responsibility on motor carrier, not insurer); *Howard v. Quality Xpress, Inc.*, 128 N.M. 79, 82, 989 P.2d 896, 899 (N.M. App. 1999) ("regulatory scheme [in Part 387] appears to place the burden of compliance with the compulsory insurance coverage requirements upon the motor carrier, not the insurer").